IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 7, 2016

**IN RE J.M.M.**

**Appeal from the Juvenile Court for Hamblen County**
**No. J130064      Janice Hope Snider, Judge**

_____

**No. E2015-01116-COA-R3-PT-FILED-MAY 25, 2016**
_____

This is a termination of parental rights case. The Department of Children's Services filed a petition to terminate the parental rights of W.J.N. (Father) with respect to J.M.M. (the Child). The trial court found clear and convincing evidence of five grounds warranting termination. The court found the same quantum of evidence reflecting that termination is in the best interest of the Child. Father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Gerald T. Eidson, Surgoinsville, Tennessee, for the appellant W.J.N.

Herbert H. Slatery III, Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

On March 18, 2013, the Child was born drug-exposed. He tested positive for oxycodone. After exhibiting drug-withdrawal symptoms, the Child was transported to East Tennessee Children's Hospital and was diagnosed with Neonatal Abstinence Syndrome (NAS). On April 9, 2013, the Child was taken into DCS custody. At that time, Father was serving a two-year sentence in the Hamblen County Jail for two felony

drug convictions.[1]  On September 3, 2013, Father appeared before the trial court for a hearing.[2]  The Child was subsequently adjudicated dependent and neglected.

DCS created a permanency plan to address the problems necessitating the Child's removal.  The permanency plan set forth Father's requirements: (1) complete an alcohol and drug assessment; (2) submit to random drug screens; (3) complete a mental health assessment; (4) complete parenting education; (5) resolve criminal issues and not incur new criminal charges; (6) have suitable housing and a legal source of income; (7) attend all of the Child's medical appointments while he was being treated for NAS; and (8) provide reliable transportation.  Father was released from jail in late September 2013.  After violating the terms of his probation, Father was again incarcerated briefly in December 2013.  Following his subsequent release, Father started having regular visits with the Child.  These interactions did not go smoothly, and Father was ultimately ordered to complete a nurturing parent curriculum.  Thereafter, Father completed the required parenting education, bonding assessment, alcohol and drug assessment and treatment, and mental health assessment and counseling.  Nevertheless, Father failed to make a single child support payment or attend any of the Child's medical appointments.  Furthermore, Father failed to maintain suitable housing for the Child and had no proof of a legal source of income.

On June 18, 2014, Father was arrested for aggravated armed robbery and incarcerated.  On August 4, 2014, DCS filed a petition to terminate Father's parental rights.  In the petition, DCS alleged five separate grounds justifying termination: (1) abandonment predicated on Father's failure to provide for the support of the Child, said ground being set forth in Tenn. Code Ann. §§ 36-1-113(g)(1) (2014) and 36-1-102(1)(A)(iv), -102(1)(D) (2014); (2) abandonment as a result of Father's wanton disregard as provided for in Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(A)(iv); (3) abandonment as a result of Father's failure to provide a suitable home, citing Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (4) Father's substantial noncompliance with the permanency plan, citing Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2) (2014); and (5) persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

---

[1] The first felony conviction was for attempted delivery on January 15, 2012, of a Schedule II controlled substance, oxycodone.  The second felony conviction was for attempted delivery on March 18, 2012, of a Schedule II controlled substance, cocaine.

[2] Though the Child's birth certificate did not list a biological father, the Child was legitimated by the trial court on September 3, 2013, after both the Child's biological mother and Father acknowledged that Father was the biological father.  The Child's biological mother voluntarily surrendered her parental rights on January 15, 2015, and is not a party to this appeal.

A trial was held on March 26 and April 30, 2015. On May 11, 2015, the trial court entered an order terminating Father's parental rights after finding clear and convincing evidence supporting each of the five grounds alleged in DCS's petition. In addition, the trial court held that there was clear and convincing evidence that termination was in the Child's best interest.

## II.

Father filed a notice of appeal on June 3, 2015, raising the following issue, as taken verbatim from his brief:

> Whether the [c]ourt erred in finding it was in the child's best interest to terminate the mother's[3] parental rights.

## III.

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)) (internal citations omitted). However, this right is not absolute. *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing *State Dep't of Children's Servs. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)).

Parties seeking to terminate a biological parent's parental rights must prove, by clear and convincing evidence, at least one statutory ground. *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *3 (Tenn. Ct. App., filed Oct. 30, 2007) (citing Tenn. Code Ann. § 36-1-113(c)(1)). A petitioner also must prove by clear and convincing evidence that termination is in the child's best interest. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (internal quotation marks and citation omitted).

---

[3] Twice in Father's brief, he asserts that the trial court erred in terminating *Mother's* parental rights. If Father really intended for this issue to involve Mother's parental rights, the issue of her rights is not something that Father has standing to raise since *Mother's* rights are not before us. If, as is probably the case, the references to Mother are a "slip of the pen," then we will consider those references to be with respect to *Father's* rights.

The Supreme Court has recently delineated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

"When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, 2007 WL 3171034, at *4 (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

This Court has previously stated that,

> [t]he ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and

4

> convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g).

*In re Audrey S.*, 182 S.W.3d at 877. In the present action, the trial court found, by clear and convincing evidence, the five grounds alluded to earlier in this opinion. On appeal, Father has not challenged any of these decisions by the trial court. Nevertheless, we are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d at 525 (". . . we hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

## V.

## A.

When analyzing the first ground for termination, abandonment predicated on Father's failure to provide for the support of the Child, the trial court made the following findings:

> The [p]etition to [t]erminate [p]arental [r]ights was filed [i]n August 2014. [Father] became incarcerated in June 2014, so the four (4) month "look back" period for determining abandonment by non-support began in February 2014.
>
> [Father] was employed at L.M.W. Metals during February through April 2014, earning at least $8.00 per hour. He was paid "under the table." [Father] was also employed by the American Book Company for several months in late 2013 to early 2014. By his own admission, [Father] has failed to pay child support for his child since [the Child's] birth. [Father] has not offered to support his child and has failed to provide any monetary assistance or other support for [the Child] except for occasional diapers and a few toys. [Father] did not give [the Child] birthday or Christmas gifts. There is no doubt that [Father] was aware of this duty to support [the Child]. [Father] made no excuses at trial for his failure to offer financial support for [the Child], simply admitting he had not done so.

The criteria for [t]ermination of [p]arental rights based on abandonment was provided to [Father] by his [DCS] caseworker . . . on two separate occasions. In addition, the [p]ermanency [h]earing [o]rder from the December 18, 2013 hearing indicates that this information was also provided to [Father].

Based upon these facts, the [c]ourt finds by clear and convincing evidence that [Father] has abandoned his minor child within the meaning of [Tenn. Code Ann.] § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv) by willfully failing to support [the Child] for more than four (4) months prior to his incarceration or at any time during the [C]hild's life.

Based on our review of the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. While Father has been incarcerated for the majority of the Child's life, the record reflects that he held two paying jobs during the months prior to his most recent incarceration and DCS's petition to terminate. Tenn. Code Ann. § 36-1-102(1)(A) defines abandonment by an incarcerated parent for failure to support:

A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration[.]

This Court has previously explained what constitutes willful failure to support:

Failure to provide support is willful if the parent is aware of his or her duty to support, is capable of paying support, makes no attempt to provide support, and has no justifiable excuse. Willful conduct is intentional or voluntary; often, intent must be inferred from circumstantial evidence.

*In re Charlie G.C.*, No. E2010-01501-COA-R3-PT, 2011 WL 1166849, at *8 (Tenn. Ct. App., filed Mar. 30, 2011) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT and M2004-01572-COA-R3-PT, 2005 WL 1021618, at *9 (Tenn. Ct. App., filed Apr. 29, 2005)). In addition, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). In the present action, the record reflects that Father was born on May 16, 1991, making him a few months shy of twenty-two years old when the Child was born. By statute, Father is presumed to have had knowledge of his duty to support the Child. At trial, however, Father freely acknowledged that, despite having multiple paying jobs prior to his most recent incarceration, he never offered any support outside of providing the Child with a couple of toys and some diapers. Thus, despite knowledge of his duty to support the Child, the capability to pay support, and the lack of a legitimate excuse for not paying, Father neglected to contribute anything to the Child beyond a few token gestures. In our view, Father's conduct is representative of willful failure to support the Child. Accordingly, we hold that, as a matter of law, the evidence clearly and convincingly establishes Father's abandonment of the Child as a result of his failure to support.

## B.

After considering the ground of Father's abandonment as a result of wanton disregard, the trial court concluded the following:

> In the present case, [Father] has a history of involvement with the criminal justice system dating prior to the birth of [the Child]. [Father] was incarcerated on felony attempted delivery of schedule II drug convictions when the [C]hild was born in March 2013 until September 2013. In December 2013, [Father] was arrested for violation of probation and served several more weeks in jail, although that charge was dismissed. Then, in June 2014, [Father] was again arrested and charged with aggravated robbery. He has been unable to make the $125,000.00 bond to secure his release on those charges and will remain in jail until his trial in July 2015.
>
> Although the [c]ourt does not presume [Father] guilty of the aggravated robbery charge, he was nevertheless in a situation which led to his arrest. [Father] has not been available to parent [the Child] for most of [the Child's] life due to [Father's] involvement with the criminal justice system

7

and/or the use of bad judgment that has repeatedly brought him into undesirable contact with law enforcement. In fact, [Father] has been incarcerated for all except nine (9) months of [the Child's] life.

Sadly, it is not difficult for this [c]ourt to find by clear and convincing evidence that [Father's] history of involvement with the criminal justice system demonstrates wanton disregard for the welfare of his child in such a manner as to constitute abandonment of his child within the meaning of [Tenn. Code Ann.] § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv).

Upon reviewing the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior . . . can alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. In the present action, Father violated his probation on multiple occasions, resulting in his incarceration in December 2013. A little over six months later in June 2014, Father was arrested for an aggravated robbery involving a firearm and the theft of prescription medication.[4] Considering the fact that Father already has multiple felony drug convictions on his record, this recent arrest involving the theft of prescription medication indicates to us that Father has made no discernible effort to avoid repeating his past criminal transgressions. Accordingly, we hold that, as a matter of law, the evidence clearly and convincingly demonstrates Father's wanton disregard for the welfare of the Child.

## C.

Upon examining the third ground for termination, Father's failure to provide a suitable home, the trial court held the following:

During the nine (9) months when [Father] was not residing in jail, he lived mostly in the [C]hild's maternal great-grandmother's home along with the [C]hild's [biological mother]. [Father] does not have a valid drivers license because he has failed to pay fines and court costs that resulted

---

[4] The record indicates that the following prescription drugs were stolen: ninety morphine pills, sixty oxycodone pills, and thirty meloxicam pills.

8

in the suspension of his driving privileges. [Father] has not had a home of his own since the [C]hild was born and has relied upon the kindness of [the biological mother's] grandmother to provide him both a home and transportation. Due to miscommunication or a lack of initiative on [Father's] part, DCS never completed a home study on this residence to determine if it was an appropriate place for [the Child] to visit or reside. In spite of assistance from [the DCS family services worker], [Father] made no effort to obtain his own housing that might be a suitable home for [the Child].

The [c]ourt therefore finds by clear and convincing evidence that [Father] has failed to provide a suitable home for his minor child through the [C]hild's entire life, and that DCS has made reasonable efforts to assist [Father].

After reviewing the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. Despite Father's contention that he has maintained the same residence for the past four years, the evidence indicates otherwise. Specifically, Father has only lived sporadically over the past four years at the home of the Child's maternal great-grandmother during the brief periods of time when he was not incarcerated.[5] At trial, when asked where he would reside when he was released from jail, Father opined that he would return to the maternal great-grandmother's home. The record, however, is devoid of any evidence indicating that the maternal great-grandmother had consented to such an arrangement beyond Father's own testimony. Regardless, we need not speculate on this question, as Father never made the maternal great-grandmother's home available for inspection. In addition, a DCS family services worker testified that the maternal great-grandmother's home had previously been deemed inappropriate in an earlier case.[6] The lingering questions about the suitability of the maternal great-grandmother's home are only compounded by the fact Father

---

[5] The record indicates that Father was incarcerated for all but nine months during the four-year window he alleges he maintained the same residence, a home that was not even Father's to claim as his own.

[6] The caseworker testified, "After speaking with my supervisor, she had stated that that home had been looked at before due to a prior DCS case and, at that time, that home was inappropriate." When asked why the home was deemed inappropriate, the caseworker said, "There were electrical outlets that were uncovered, there were wires that were hanging down, and they excessively smoked inside the home."

9

acknowledged at trial that he would not be in a position to purchase or rent a suitable residence if he were released from jail that day. When looking at all of the evidence in the record, we do not see an individual who has "had the same residence for four years." On the contrary, we see a man who is currently incarcerated, has spent more time living in jail than he has living in a home that is not even his, and offers a highly questionable plan to provide a suitable home for the Child. As a result, we hold, as a matter of law, that the evidence clearly and convincingly demonstrates that Father has failed to provide a suitable home for the Child.

**D.**

When considering the ground of Father's substantial noncompliance with the permanency plan, the trial court concluded the following:

> [Father] is commended for completing a number of the requirements of the [p]ermanency [p]lans. He has completed an alcohol and drug assessment and complied with all counseling required; he has established paternity of [the Child]; he completed parenting classes; and completed a mental health assessment and all required follow-up steps. [Father] was also gainfully employed during most of the time he has not been in jail since the [C]hild's birth, although he did not use his income to support [the Child].

> \* \* \*

> While [Father] completed many of the requirements of the [p]ermanency [p]lan, he has failed to adhere to the most important aspects of this plan. [Father] has remained unable to stay out of jail and he has remained unable to provide safe, stable, consistent housing for his son.

> Likewise, [Father] has been unable to develop a secure relationship with [the Child] due to the severity of [the Child's] emotional issues, [Father's] inability to continue visits due to his incarceration, and his failure to attend medical and therapeutic appointments for the [C]hild that would have provided critical insight into [the Child's] condition. The [c]ourt does not doubt that [Father] has tried

10

to establish a bond with his son to the best of [Father's] ability. But . . . [F]ather simply has not been able [to] acquire the necessary skills to make this relationship successful. [The DCS family services worker] went above and beyond reasonable efforts . . . to assist [Father] and make the relationship between him and [the Child] a success. However, without the additional time, knowledge[,] and resources (such as an appropriate, stable home environment) that it was necessary for [Father] to spend with [the Child] in a setting conducive to building that relationship, [Father] was doomed to fail. Although [Father] completed many of the plan's steps, he has failed to accomplish the critical goals that would facilitate re-unification with [the Child] since [Father] has not been able to maintain a suitable home, remain free from incarceration or adequately bond with [the Child.]

For these reasons the [c]ourt finds by clear and convincing evidence that [Father] has failed to substantially comply with the reasonable requirements of the [p]ermanency [p]lans in this case.

After reviewing the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. On the topic of substantial noncompliance, our Supreme Court has previously explained,

Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. *Black's Law Dictionary* defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990). *In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to the requirement*.

*In re Valentine*, 79 S.W.3d at 548 (emphasis added). As we have already explained in this opinion, Father has failed to avoid criminal activity and maintain a suitable home for the Child, both required by the permanency plan. While parenting classes and counseling, also required by the permanency plan, are certainly productive steps Father

has taken, neither can reasonably make up for his lack of a suitable home, much less his ongoing involvement with the criminal justice system. In our view, when looking at the permanency plan requirements, Father's shortcomings far outweigh his progress. Accordingly, we hold that, as a matter of law, the evidence clearly and convincingly demonstrates that Father has not substantially complied with the permanency plan.

**E.**

Finally, the trial court held the following with respect to the ground of persistence of conditions:

> It has been more than six (6) months since [the Child] was removed from the custody of his parents in April 2013, due to . . . [F]ather's incarceration and inability to provide a suitable home for the [C]hild. Over two years later, [Father] remains in circumstances that are identical to those existing on the date [the Child] was placed into the custody of the State of Tennessee. Any progress he made to comply with the requirements of the [p]ermanency [p]lan in this case is effectively negated by the reality of his present circumstances. [Father] remains in jail[,] and his future is uncertain. He has no home, no drivers license[,] and no job if he was released tomorrow.
>
> [The Child's] emotional condition remains unstable and difficult to manage.
>
> The [c]ourt finds by clear and convincing evidence that the conditions which led to this child's removal and placement in state custody continue to persist despite all efforts of both the State of Tennessee and [Father]. These conditions, which would likely lead to further neglect of the [C]hild, are unlikely to be remedied soon so that the [C]hild could be returned safely to a stable home environment. DCS has, for almost two years, made reasonable efforts to help [Father] remedy the conditions which led to [the Child's] removal, to no avail. Consequently, continuation of the parent[-]child relationship greatly diminishes the chances of this child being placed into a safe, stable[,] and permanent home.

Based on our review of the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. Tenn. Code Ann. § 36-1-113(g)(3) authorizes termination of parental rights when:

> (3)(A)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;
>
> > (i)  The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) still persist;
> >
> > (ii)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> >
> > (iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

In this action, we agree with the trial court that Father's situation at the time of trial essentially mirrored the state he found himself in when DCS filed its petition to terminate in 2014. At that time, Father was incarcerated, did not have a suitable home, and did not have a legal source of income. At the time of trial, Father was still incarcerated, did not have a suitable home, and did not have a legal source of income. Given this reality, and the fact the record indicates Father has more or less had these particular issues ever since the Child was born in 2013, we are hard pressed to see a situation where Father can remedy all of his shortcomings in the near future. Ultimately, Father's ongoing issues lead us to the conclusion that continuation of his parent-child relationship with the Child would greatly hinder the likelihood of the Child being integrated into a safe, stable, and permanent home. Thus, we find that, as a matter of law, the evidence clearly and convincingly exhibits persistence of conditions.

# VI.

After finding that there are five statutory grounds warranting termination of Father's parental rights, we may now focus on whether termination is in the Child's best interest. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i):

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)   Whether the parent or guardian has maintain regular visitation or other contact with the child;
>
> (4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6)   Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7)   Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol,

14

controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In the present action, the trial court's May 11, 2015 order terminating Father's parental rights included the following "best interest" analysis:

> It is in [the Child's] best interests for termination to be granted because . . . Father . . . has not made changes to his conduct or circumstances which enable him to establish a safe, stable, suitable home for [the Child.] Two years have passed and [Father] is no closer to providing an appropriate home for [the Child] than existed on the date [the Child] entered state custody. Due to . . . [F]ather's extended absence, there is no meaningful relationship between him and [the Child]. In fact, it is questionable to what extent [the Child] would even remember . . . [F]ather at this point.
>
> The [c]ourt is sympathetic to [Father's] hope for a future relationship with [the Child] and his love for this child. [Father] has made efforts to be a father to [the Child], but [Father's] circumstances and lifestyle simply cannot meet [the

15

Child's] needs. [The Child] needs permanency in his life *now*, and it would be detrimental to [the Child] to place his stability on hold while [Father] attempts to resolve his criminal difficulties.

[The Child] suffers from severe attachment disorder and other emotional issues that limit his ability to interact with strangers or other persons who are not consistently familiar to him in his daily environment. He is overwhelmed and traumatized by change. [The Child's] pre-adoptive foster family has gone above and beyond to accommodate [the Child's] special needs. It would be extremely difficult, if not impossible, for [the Child] to adjust and thrive in an alternative environment at this stage of his life. It is manifestly in [the Child's] best interest to remain with the foster family who desire to adopt him and give him permanency in his life.

On appeal, Father contends that the trial court "failed to consider certain important factors or didn't give them the weight they should have been given." In support of this contention, Father notes that he has (1) completed an alcohol and drug assessment; (2) passed drug screens; (3) established that he is J.M.M.'s biological father; (4) completed parenting classes; (5) undergone a mental health assessment; (6) attended grief counseling and classes for criminal addictive behavior; (7) provided transportation for J.M.M. despite not having a valid driver's license; (8) completed a bonding assessment; (9) had the same residence for four years; and (10) exercised all available visitation opportunities.

We are not persuaded by Father's argument. As we have already articulated, Father has taken some steps towards making himself capable of being a suitable parent for the Child. In particular, we noted his participation in parenting classes and counseling. Nevertheless, these efforts hardly outweigh Father's glaring deficiencies as a parent, specifically his ongoing involvement with the criminal justice system and his inability to secure suitable housing for the Child. No amount of parenting classes and counseling can make us overlook the reality that Father has been arrested and incarcerated multiple times during the Child's young life. Furthermore, we are troubled by the fact that his most serious arrests revolve around either the attempted sale or theft of narcotics, with the most recent incident involving a victim being held at gunpoint and subsequently beaten. Such behavior is hardly indicative of an individual suitable to be a parent. Our apprehension is only compounded by Father's lack of suitable housing and his clear failure to address this issue with the seriousness it deserves. Rather than being

proactive about his greatest shortcomings, Father now finds himself incarcerated, without a home of his own or a legal source of income, and lacking a coherent plan for rectifying these problems. As a result, he has missed the formative years of the Child's life, effectively eliminating any meaningful relationship that might have previously existed. In our view, Father has failed to make any lasting adjustment in his life that would lead us to conclude it would be in the Child's best interest to keep his parental rights intact. This conclusion is only reinforced by the evidence in the record showing the loving care the Child has received in the stable foster home where he has resided since April 2013. Accordingly, we conclude, as a matter of law, that the trial court was correct in holding that there is clear and convincing evidence that termination of Father's parental rights is in the Child's best interest.

## VII.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, W.J.N. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE